UNITED STATES of America, Plaintiff–Appellee,

v.

Donald BENNETT and Steven R. Keith, Defendants–Appellants.

Nos. 89–2434, 89–2435.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1990.

Decided July 24, 1990.

Alexander Vesselinovitch, Asst. U.S. Atty., Barry R. Elden, and Matthew M. Schneider, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, for plaintiff-appellee.

William J. Stevens and John A. Meyer, Chicago, Ill., for defendants-appellants.

Before WOOD, Jr. and FLAUM, Circuit Judges, CRABB, Chief District Judge.*

FLAUM, Circuit Judge.

Defendants Donald Bennett and Steven R. Keith were convicted of various offenses relating to the armed robbery of five Chicago-area financial institutions which occurred during October and November of 1987. They challenge their convictions on numerous constitutional and statutory grounds. We affirm the convictions.

## I.

In November 1987, detectives of the Chicago Police Department were investigating a series of five bank robberies that had occurred on the south side of Chicago and in Oak Lawn, Illinois. The police knew that several of the robberies had been committed by two assailants driving a dark blue four door Cadillac with a blue vinyl top. Bank surveillance photographs and eyewitness reports revealed that one of the suspects spoke with a southern accent and wore a light colored red wig during the robberies.

On the morning of November 10, 1987, Detective Cummings observed a dark blue four door Cadillac with a blue vinyl roof in the parking lot of the Carlton Midway Motel in Chicago. A computer check of the license plates revealed that the car's plates were registered to a 1976 Ford belonging to defendant Donald Bennett of 7257 South Western Avenue in Chicago. Detective Cummings called for backup and was soon joined by Lieutenant Cline and Sergeant McKenna. The officers proceeded to the motel's office and checked with the desk clerk who confirmed that the Cadillac belonged to Donald Bennett, who was staying in room 120.

The officers proceeded to room 120 and Lieutenant Cline knocked on the door. A voice with a southern accent from inside the room asked who was at the door, and Lieutenant Cline replied, "I'm a police officer. I want to talk to you about your car." Donald Bennett opened the door and stepped out into the hallway. Detective Cummings immediately recognized him from bank surveillance photographs as one of the bank robbers and placed him under arrest. When the officers asked him whether anyone else was in the room, he replied that there was another man inside on the bed.

At that point, the officers entered the motel room. Once inside, Detective Cummings observed a large revolver in an open grey suitcase near the front door and defendant Steven Keith in the nearby bed. He recognized Keith as one of the bank robbers from bank surveillance photographs and placed him under arrest. Keith told the officers that the grey suitcase containing the revolver belonged to him. Detective Cummings searched the bag and found ammunition and a bill of sale for the purchase of a 1977 Ford LTD. The officers also found a loaded .357 Magnum and a loaded 12 gauge sawed-off shotgun in a black suitcase on top of the bed, a loaded .38 caliber snub-nose revolver under the mattress of one of the beds, and a light colored reddish-brown wig in a blue nylon bag.

The defendants were indicted in a 13 count indictment charging them each with one count of conspiring to take money by force from federally insured banks and sav-

* The Honorable Barbara B. Crabb, Chief Judge of the United States District Court for the Western District of Wisconsin, is sitting by designation.

ings and loans in violation of 18 U.S.C. § 371. Bennett was charged with five counts of armed robbery in violation of 18 U.S.C. § 2113(a) and five counts of using a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c). Keith was charged with four counts of violating both § 2113(a) and § 924(c).

At trial, Bennett admitted committing all five bank robberies but relied on a defense of insanity, offering evidence that he was psychotic and suffering from schizophrenia at the time of the robberies. He testified that God's voice and his mother's voice told him to get the money from the banks, and that his co-assailant was Frank Collins of Louisville, Kentucky, and not Keith. Keith, who did not testify at trial, relied on an alibi defense.

The jury found both Bennett and Keith guilty on all counts. Bennett was sentenced to 50 years in prison including five years on the first § 924(c) conviction and ten years for each of four "second or subsequent" convictions. Keith was sentenced to 38 years and 4 months in prison, including five years on the first § 924(c) conviction and ten years each for the remaining three § 924(c) convictions. The defendants raise several challenges to their convictions. We address each in turn.

## II.

Bennett and Keith challenge their convictions claiming that the district court erred in denying their motions to suppress the evidence found in the motel room at the time of their arrest. They argue that the officers' warrantless entry into the motel room and subsequent search of their luggage was unreasonable and violated their fourth amendment rights. In denying the motions to suppress, the trial court found that the warrantless entry into the motel room was proper in light of the exigent circumstances confronting the officers and that the officers properly seized evidence in the motel room under the plain view and search incident to arrest exceptions to the warrant requirement.

■ Our standard of review of a denial of a motion to suppress is well settled. We must affirm the district court's denial of the motion to suppress unless we find that the decision was clearly erroneous. *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990). Our inquiry is fact-based and requires that we give particular deference to the district court who had the opportunity to hear the testimony and observe the demeanor of the witnesses. *United States v. D'Antoni*, 856 F.2d 975, 978 (7th Cir.1988).

■ The fourth amendment protects individuals from unreasonable searches and seizures. A warrantless search or seizure is *"per se* unreasonable unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' " *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1981). In *United States v. Napue*, we held that arresting officers may make a warrantless entry into a premises under the exigent circumstances exception to the warrant requirement when, following an arrest outside the premises, the arresting officers have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public. 834 F.2d 1311, 1327 (7th Cir.1987). *See also United States v. Agapito*, 620 F.2d 324, 336 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

■ Applying this two-part test, we find that the officers' entry into the motel room was permissible. A review of the record reveals that Lieutenant Cline announced his office after he knocked on the door of the motel room. After Bennett stepped out of the room and was arrested, he told the officers that a third person was present in the room. Moreover, the officers were aware that at least two suspects were involved in each of the robberies. Under these circumstances, it was reasonable for the officers to believe that a third person

was in the room and that he knew of their presence. The officers also had a reasonable belief that the third person was dangerous; they knew that the bank robbers had an extensive collection of weapons that they used and brandished during the commission of the offenses and that they were considered to be extremely dangerous.

A more difficult issue is the officers' search of the defendants' luggage after their arrest. The district court found that under the specific facts presented, the officers were justified in searching the luggage under the search incident to arrest exception to the warrant requirement. The defendants claim that the search exceeded the scope of a permissible search incident to arrest because they were handcuffed and placed against the wall of the room at the time of the search.

■ In *Chimel v. California,* the Supreme Court held that police officers, subsequent to a lawful arrest, may search the person of the arrestee and any area in his immediate control without a search warrant to protect them from danger and prevent the destruction of evidence. 395 U.S. 752, 768, 89 S.Ct. 2034, 2042, 23 L.Ed.2d 685 (1969). The search must be contemporaneous with the arrest, conducted to prevent use of a weapon or the destruction of evidence and limited to the area immediately within the arrestees' immediate control. As an exception to the warrant requirement, "the scope of such a search has been narrowly drawn and carefully delineated to accommodate only those interests it was created to serve." *United States v. Queen,* 847 F.2d 346, 352 (7th Cir.1988) (quoting *United States v. Graham,* 638 F.2d 1111, 1114 (7th Cir.), *cert. denied,* 450 U.S. 1034, 101 S.Ct. 1748, 68 L.Ed.2d 231 (1981)).

■ The defendants do not seriously dispute the district court's finding that the officers conducted the search contemporaneously with the arrests, and that they were searching for weapons or other dangerous instrumentalities. The primary issue raised by the defendants is whether the search was limited to the area within their immediate control. We find that although the defendants were handcuffed and placed against the wall of the room at the time of the search, the facts of this case are such that the district court's finding that the search was limited to the area within their immediate control is not clearly erroneous. Lieutenant Cline, whose testimony was expressly credited by the district court, testified that the officers conducted the search because they feared that the defendants would gain access to weapons or that accomplices who knew where weapons were hidden would storm the room. "In a suppression hearing, the trial court's determinations which rest upon credibility and reasonable inferences will not be set aside unless clearly erroneous." *Queen,* 847 F.2d at 352 (quoting *United States v. Skowronski,* 827 F.2d 1414, 1417 (10th Cir. 1987)). At the time of the arrests, the officers were aware that the defendants had used several different weapons during the robberies and that one weapon, a loaded revolver, was in plain view. The officers also testified that they were concerned with their safety since the motel room was small and cramped with ready access from the outside through the several doors leading out of the room and because they did not know the number of room keys checked out. Lieutenant Cline testified that with the multiple entrances to the room, the officers "wanted to secure any weapons in there where other people might know where those weapons were if they burst into the room to try to help their friends." In this situation, we find that the officers reasonably feared that someone else was going to come to the room who knew where the other weapons were or that the defendants would position themselves to take advantage of any hidden weapons or instrumentalities.

The defendants argue that the fact that they were handcuffed is dispositive here as they could not have gained access to the weapons. We have recognized, however, that "[c]ustodial arrests are often dangerous; the police must act decisively and cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp."

*Queen,* 847 F.2d at 346 (quoting *United States v. Lyons,* 706 F.2d 321, 330 (D.C.Cir. 1983)). *"Chimel* does not require the police to presume that an arrestee is wholly rational. Persons under stress may attempt actions which are unlikely to succeed." *Queen,* 847 F.2d at 354 (quoting *United States v. McConney,* 728 F.2d 1195, 1207 (9th Cir.1984)) (en banc). This was hardly a situation where "law enforcement officers have reduced ... property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence." *United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977). Accordingly, the district court's finding that the warrantless search was a permissible search incident to arrest is not clearly erroneous.

### III.

■ Bennett and Keith contend that the district court misconstrued 18 U.S.C. § 924(c) in imposing consecutive sentences for their convictions on the "second or subsequent" firearms counts charged in the indictment. Section 924(c) provides that anyone using or carrying a gun during a crime of violence shall be subject to imprisonment for five years, and that the prison time shall not run concurrently with any other term of imprisonment including that imposed for the original crime of violence. In the case of a defendant's "second or subsequent conviction of this subsection, such person shall be sentenced to imprisonment for ten years." 18 U.S.C. § 924(c). The defendants were convicted of multiple counts of violating § 924(c) and were each given five years imprisonment for the first conviction, and ten years for each "second or subsequent" conviction. The issue raised by the defendants is whether the enhanced penalty provision of § 924(c) applies to separate offenses charged in the same indictment.

This Court has yet to address the application of § 924(c) to separate offenses charged in the same indictment, but two other circuits have. In *United States v. Rawlings,* 821 F.2d 1543, 1545 (11th Cir. 1987), the Eleventh Circuit concluded that § 924(c) mandates an enhanced ten year prison sentence for a defendant convicted of two section 924(c) offenses charged in the same indictment. The court found that the plain language of the statute was controlling: the term "subsequent" means "following in time, order or place," and implies that the second conviction must occur on a later date than the first conviction. The term "second" merely means another or additional conviction, and may apply to two convictions contained in the same indictment. The court reasoned that the purposes behind § 924(c)—to discourage offenders from employing a firearm in a violent or drug crime and to significantly increase the penalty for an offender who uses a firearm in two separate crimes—would not be served by requiring that the defendant be convicted and sentenced under separate and distinct indictments before applying the enhanced penalty. In *United States v. Foote,* 898 F.2d 659, 668 (8th Cir.1990), the Eighth Circuit reviewed the court's reasoning in *Rawlings* and found it to be persuasive. So do we. The language of § 924(c) is clear and unambiguous; an offender is to receive an enhanced penalty for each offense which is either "second or subsequent," regardless of whether the offenses are charged in the same or in separate indictments. In addition, while *Rawlings* and *Foote* involved situations where the defendants had been charged with only two § 924(c) counts in the same indictment, the rationale applies equally where the offenders are charged with both "second" and "subsequent" counts in the same indictment.

■ Turning to the case at bar, the defendants were properly sentenced to consecutive ten year sentences for each second or subsequent conviction. Between them, Bennett and Keith were convicted of committing five separate bank robberies from September 4, 1987 to November 2, 1987. The five robberies occurred on five different dates and each required proof of different sets of facts. That they were all charged in the same indictment does not

render them any less distinct for the purposes of § 924(c); after the first § 924(c) conviction, the next conviction becomes the "second," and the remaining convictions become "subsequent" convictions.

## IV.

Bennett contends that the district court erred in determining that he was competent to stand trial. Prior to trial, Bennett filed a motion pursuant to 18 U.S.C. § 4241 for a hearing to determine his competency to stand trial. Bennett claimed that he suffered from paranoid schizophrenia and thus was unable to understand the nature of the proceedings against him or assist in his defense. After the hearing, the district court concluded that Bennett was competent to stand trial and denied the motion. He contends on appeal that the district court's decision was erroneous on the ground that the court arbitrarily ignored medical evidence that he was incompetent and unable to appreciate the nature and consequences of the proceeding and assist properly in his defense.

 A trial court's finding of competency to stand trial will not be set aside on review unless it is clearly erroneous. *United States v. Lovelace*, 683 F.2d 248, 251 (7th Cir.1982). We find that the court's determination of competency is well supported by the evidence and is not clearly erroneous. The defendant presented just one witness at the competency hearing, Dr. Daniel Schiff. Dr. Schiff, who was retained solely for the purposes of the competency hearing, interviewed Bennett on four separate occasions and concluded that Bennett had a paranoid schizophrenic reaction. At the hearing, however, Dr. Schiff conceded that he did not perform any psychological tests on Bennett and that Bennett may have feigned some or all of the symptoms. The district court found that Bennett had an incentive not to speak honestly with Dr. Schiff and disagreed with his ultimate conclusions.

Dr. Schiff's conclusions were contradicted by those of Dr. James Janacek, a licensed psychiatrist who interviewed Bennett on two occasions. Dr. Janacek testified at the competency hearing that Bennett claimed to be suffering from amnesia but that amnesia is not characteristic of paranoid schizophrenia. Dr. Janacek concluded that Bennett's claims of amnesia were self-serving and that he was competent to stand trial. Dr. Schiff's opinion was further undermined by the testimony of Dr. Marjorie Muzyczka, the chief psychologist at the Metropolitan Correctional Center where Bennett was being held before trial. Dr. Muzyczka testified that Bennett was at all times well-oriented as to time, place and person and that he did not exhibit any psychotic tendencies. Based on the evidence presented at the competency hearing and the district court's credibility determinations, we find that the court's conclusion concerning competency was not clearly erroneous.

 At trial Bennett relied on an insanity defense. He contends on appeal that since the government offered no expert psychiatric testimony at trial to rebut his expert testimony that he was suffering from paranoid schizophrenia at the time of the robberies, the trial court erred in refusing to enter judgment notwithstanding the verdict of guilty. The defendant's position finds no support in law. The government is not required to rebut expert testimony with its own expert as it may accomplish the same result by presenting lay witnesses and other evidence and by undermining the defense expert's credibility through cross examination. *United States v. Kennedy*, 578 F.2d 196, 198 (7th Cir. 1978). With regard to the merits of Bennett's insanity defense, a review of the record reveals that he failed in his burden of establishing the affirmative defense of insanity by clear and convincing evidence as is required by 18 U.S.C. § 7. Accordingly, Bennett's claim is without merit.

## V.

Finally, Keith challenges the sufficiency of the evidence with regard to his convictions on counts four through seven of the indictment for armed robberies of the Hemlock Federal Bank and the Preferred Sav-

ings and Loan. The government's theory at trial was Keith drove the getaway car after Bennett robbed each of these institutions.

█ Keith bears a heavy burden in seeking to have his convictions overturned on sufficiency grounds. We must examine the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences, and can reverse only if we find that a reasonable fact-finder could not have found the essential elements of the offense beyond a reasonable doubt. *United States v. Ocampo*, 890 F.2d 1363, 1370 (7th Cir.1989). We can "reverse a jury's verdict of conviction only if the defendant can establish that the record 'contains no evidence, regardless of how it was weighed, from which the jury could find guilt beyond a reasonable doubt.'" *Id.* Keith has not met this burden.

█ We begin with the evidence offered at trial by the government regarding Keith's involvement with the Hemlock Bank robbery. The government presented the testimony of Dennis Frazier, a used car salesman, who identified Keith as Bennett's companion at the time Frazier sold them a Mercury Cougar on September 10, 1987. Bennett and Keith told Frazier that they were looking for a car to provide them with transportation to work. Four days after the purchase of the car, Bennett entered the Hemlock Bank armed with a gun. After removing all the money from the tellers' cash trays, Bennett fled to the Mercury Cougar waiting outside with its engine running. Bennett jumped in the moving car and left the area. The Mercury Cougar purchased by Bennett and Keith was found 200 yards from the bank two hours after the robbery.

Of course, mere proof that Keith purchased the car with Bennett would be insufficient to support the government's desired inference that Keith was the driver of the vehicle at the robbery. At the time of the robbery, however, Thomas Shermer was parked in front of the bank waiting for his wife. The parties stipulated that Shermer saw Bennett run out of the bank and get into a late model Cougar which was driven by a white male with "light or blond hair." Keith has dark hair but police discovered a light colored red wig when they searched the hotel room shared by Keith and Bennett. The government argued that Keith was wearing a wig or a light colored hat at the time of the robbery; it would not have been unreasonable for a jury to infer that Keith was wearing the wig found in his hotel room while driving the getaway car that he and Bennett had purchased only four days before.

The government's evidence also supported the jury's conclusion that Keith was driving the getaway car at the Preferred Savings robbery. The government presented the testimony of Shelly Carson, a teller at Preferred. Carson testified that Bennett robbed the bank on October 6, 1987, and that he drove away with another person. The government also offered proof that Bennett and another man checked into the Carlton Midway Motel a few hours after the robbery. Bennett checked out of the motel at 7:36 a.m. the next morning, and later that day he and Keith purchased a 1972 Buick from another used car dealer.

We cannot say that a reasonable jury, in light of this evidence, could not have concluded that Bennett's accomplice in the Preferred Savings robbery was Keith. The jury need not have viewed the evidence of Keith's involvement in the Preferred Savings robbery (or in the Hemlock robbery, for that matter) in isolation from the wealth of evidence suggesting that he and Bennett worked as a team. The same clerk that testified that Bennett checked into the motel with another man noted that Bennett was always with the same man when he checked into the motel. When the duo was arrested at the motel they were found to be surrounded by an arsenal of weapons, other tools of the trade, and over $3,000 in cash, some of which was secreted in a toiletry kit. Keith admitted that a suitcase found in the room containing a .38 caliber pistol and a bill of sale for the 1977 Ford LTD used in a later robbery belonged to him. While such evidence, in isolation, would not support Keith's conviction for this robbery, it does lend reasonableness to

the jury's conclusion that Bennett's accomplice during the Preferred Savings robbery must have been Keith. We therefore affirm Keith's convictions on counts 4–7.

## VI.

Accordingly, we affirm each of the convictions of appellants Bennett and Keith.